# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 16-3039

RICHARD D. SIMMONS, APPELLANT,

V.

ROBERT L. WILKIE,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued April 25, 2018                                              Decided September 20, 2018)

*Kenneth M. Carpenter*, of Topeka, Kansas, for the appellant.

*Mark D. Gore*, with whom *Meghan Flanz*, Interim General Counsel; *Mary Ann Flynn*, Chief Counsel; and *Kenneth A. Walsh*, Deputy Chief Counsel; and *Joshua L. Wolinsky*, Appellate Attorney, all of Washington, D.C., were on the brief for the appellee.

Before DAVIS, *Chief Judge*, and BARTLEY and ALLEN, *Judges*.

BARTLEY, *Judge*: Veteran Richard D. Simmons appeals through counsel a May 13, 2016, Board of Veterans' Appeals (Board) decision that found that a September 1974 regional office (RO) rating decision denying service connection for an acquired psychiatric disorder did not contain clear and unmistakable error (CUE). Record (R.) at 2-19. This matter was referred to a panel of the Court principally to address the Court's harmless error analysis framework post-*Sanders*, particularly in the context of reviewing Board decisions on CUE motions. *Shinseki v. Sanders*, 556 U.S. 396 (2010). We hold that, although the Board erred in analyzing two statutory presumptions when it found no CUE in the 1974 decision, that error is harmless because it did not affect the essential fairness of the adjudication or the Board's ultimate determination that the 1974 RO decision did not contain CUE; therefore, the Court will affirm the May 13, 2016, Board decision.

## I. BACKGROUND

Mr. Simmons served on active duty in the U.S. Navy from November 1968 to January 1970. R. at 43. Upon entry into service, he denied "frequent trouble sleeping," "frequent or terrifying nightmares," "depression or excessive worry," and "nervous trouble of any sort." R. at

119. In a contemporaneous examination, a service physician documented a normal clinical examination with no noted psychiatric symptoms. R. at 121-22.

In April 1969, Mr. Simmons was hospitalized for two days for psychiatric observation following a suicide attempt. R. at 127-29. Upon admission, he requested medication for "nerves," and the service clinician provided diagnostic impressions of "depressive reaction" and "attempted suicide." R. at 127-28. The hospital discharge summary reflects that Mr. Simmons had "a long history of 'nerve' problems . . . [with] several episodes of 'home sickness' and depression since coming aboard [the ship] in November [1968]." R. at 129. The service clinician diagnosed "situational depression." *Id*. Mr. Simmons remained depressed and under observation for 48 hours until "he received a letter from home [at which point h]is spirits lifted measurably and he was discharged to duty." *Id*.

In December 1969, following unsuccessful attempts at obtaining a hardship discharge, Mr. Simmons was referred for neuropsychiatric evaluation due to frequent feelings of depression and "inability to adjust to Naval life." R. at 130. The service clinician documented a moderately depressed mood, appropriate affect, clear sensorium, intact memory, and logical and coherent thought processes. *Id*. The clinician asserted that Mr. Simmons had "no evidence of psychosis"; he diagnosed Mr. Simmons with immature personality disorder and recommended administrative discharge due to unsuitability. R. at 130-31. The January 1970 service separation examination report reflects a normal clinical examination with no noted psychiatric symptoms. R. at 106-07.

In September 1972, Mr. Simmons sought non-service-connected pension benefits. In December 1972, a VA RO granted pension benefits due to polyarthritis of multiple joints. R. at 69-70.

In June 1974, Mr. Simmons requested disability compensation for rheumatoid arthritis, stating "there is a reasonable presumption that my rheumatoid arthritis condition was manifested as a direct result of my mental depression in service and culminated in my administrative discharge." R. at 52. In an attached statement, Mr. Simmons's private hematologist opined that "it is a reasonable presumption that the illness manifested as mental depression during [service] is the same illness now manifested as arthritis involving multiple joints." R. at 49. He added that "it [is] likely that the chronic disorder [Mr. Simmons] now has was present at the time of his military service." *Id*.

2

Upon VA examination in August 1974, Mr. Simmons reported current symptoms of severe pain, weakness, weight loss, loss of appetite, nervousness, sleep disturbances, and stiffness. R. at 1453. Following medical examination, the examiner diagnosed rheumatoid arthritis. R. at 1456. Upon psychological examination, Mr. Simmons stated that while he was overseas, he felt tense, nervous, and homesick, causing him to drink excessively. R. at 1457. He denied in-service hospitalization except for acute intoxication. *Id*. He stated that he "got along alright after service[,] although he felt a little nervous at times," he worked regularly for almost 2 years at a Dupont plant until he developed rheumatoid arthritis, and that rheumatoid arthritis has been progressive since then, involving more joints and constant medication. *Id*. He further stated that he "feels tense and nervous most of the time and this is worse when [there is] more pain in his joints" and attributed some insomnia, depressed mood, and decreased concentration to increased physical symptoms. *Id*. Following examination, the examiner diagnosed "anxiety reaction with depressive features, moderate only, secondary to arthritic condition." *Id*.

In September 1974, the RO denied service connection for rheumatoid arthritis and a nervous condition. R. at 1448-49. The RO found no evidence that Mr. Simmons experienced chronic neurosis during service and noted that he was administratively discharged due to immature personality disorder. R. at 1449. Likewise, the RO found no evidence that Mr. Simmons experienced arthritis during service or within one year following service. *Id*. The RO concluded that neither the arthritic condition nor the anxiety reaction was incurred during service, and that the currently diagnosed anxiety reaction was not related to the immature personality disorder that resulted in his separation from service. R. at 1448. Mr. Simmons filed a Notice of Disagreement (NOD) with the September 1974 RO decision, but did not perfect an appeal to the Board following issuance of a Statement of the Case (SOC).

In 1977, Mr. Simmons successfully filed to reopen his claims for service connection, but they were again denied in an unappealed April 1977 RO decision.[1] In January 1990, Mr. Simmons

---

[1] The Court notes that in August 1995, Mr. Simmons alleged CUE in the April 1977 RO decision, which was denied by the RO in February 1996 and by the Board in January 1998. *See* R. at 472. Mr. Simmons appealed the adverse Board decision to this Court. In May 2000, the Court issued a precedential decision affirming the Board decision. *Simmons v. West*, 13 Vet.App. 51 (2000). In August 2000, the Court withdrew its May 2000 decision, denied Mr. Simmons's motion for reconsideration, and again affirmed the Board decision. *Simmons v. West*, 14 Vet.App. 84 (2000). However, following a motion to vacate and additional procedural development, the Court set aside the January 1998 Board decision and remanded the matter to the Board for readjudication. *Simmons v. Principi*, 17 Vet.App. 104 (2003). Upon readjudication, the Board, in August 2004, found that Mr. Simmons's 1995 motion alleging CUE regarding the denial of service connection for a nervous disorder was without legal merit as it was subsumed by the Board's February 1991 decision. R. at 471-94. The Board also dismissed the motion alleging CUE regarding the denial

3

again filed to reopen a claim for service connection for emotional trauma and a nervous breakdown. In an unappealed February 1991 decision, the Board reopened the claim for service connection, but denied the underlying claim.

In December 2005, Mr. Simmons, through counsel, filed a CUE motion as to the September 1974 RO decision that denied service connection for rheumatoid arthritis and a nervous condition with depressive features. R. at 326-33. In September 2009, the RO found no CUE in the September 1974 RO decision with respect to both claims. R. at 315-17. In September 2010, Mr. Simmons filed an NOD only as to the RO's finding of no CUE in the September 1974 denial of service connection for an acquired psychiatric disability. R. at 293-300. Following a March 2012 SOC, R. at 234-47, Mr. Simmons perfected an appeal to the Board in April 2012, R. at 194-202.

In March 2015, the Board found no CUE in the September 1974 RO decision that denied service connection for an anxiety disorder with depressive features. R. at 184-92. In its decision, the Board found that the September 1974 RO decision was subsumed by the February 1991 adverse Board decision and, therefore, was not subject to a CUE challenge. R. at 190. Mr. Simmons appealed that Board decision to this Court. In a January 2016 joint motion for remand, the parties agreed that readjudication was needed because the Board erred in finding that the February 1991 Board decision subsumed the September 1974 RO decision because the February 1991 Board decision did not involve a de novo review of the same issue before the RO in 1974. R. at 137-42 (citing *Brown v. West*, 203 F.3d 1378, 1381-82 (Fed. Cir. 2000) and noting that the Board, in February 1991, determined that the evidence submitted subsequent to April 1977 did not demonstrate that a psychiatric disorder was present during active service and, therefore, did not conduct a de novo review of the entire record to determine if the September 1974 RO decision was erroneous).

In the May 2016 decision on appeal, the Board found no CUE in the September 1974 RO decision that denied service connection for an acquired psychiatric disorder. R. at 4-5. The Board found that Mr. Simmons failed to demonstrate that the September 1974 RO decision misapplied, or failed to apply, any applicable law or VA regulation, or that the decision otherwise contained CUE. R. at 18. In consideration of Mr. Simmons's arguments regarding statutory presumptions, the Board specifically found that neither the presumption of soundness nor the presumption of

---

of service connection for arthritis as legally insufficient. *Id*. Mr. Simmons did not appeal the August 2004 Board decision.

4

service incurrence applied. R. at 16-17. The Board further found that most of Mr. Simmons's arguments "boil down to allegations that the RO in 1974 improperly weighed the evidence of record in denying the claim; such allegations can never rise to the level of CUE." *Id*. The Board added that "[Mr. Simmons] has not offered an explanation as to how the outcome would be manifestly different but for the errors claimed." *Id*. This appeal followed.

## II. THE BOARD'S CUE ANALYSIS

When a prior final RO or Board decision contains CUE, that decision may be reversed or revised, resulting in correction of the error effective the date of its commission. 38 U.S.C. §§ 5109A, 7111; *see DiCarlo v. Nicholson*, 20 Vet.App. 52, 54-58 (2006); 38 C.F.R. §§ 3.105 (2018), 20.1400-1411 (2018). CUE is established when the following components are met: (1) Either the correct facts as they were known at the time were not before the adjudicator, the adjudicator made an erroneous factual finding, or the statutory or regulatory provisions extant at the time were incorrectly applied; (2) the alleged error is "undebatable," not merely a "disagreement as to how the facts were weighed or evaluated"; and (3) the error "manifestly changed the outcome" of the prior decision. *Russell v. Principi*, 3 Vet.App. 310, 313-14, 319 (1992); *see King v. Shinseki*, 26 Vet.App. 433, 439 (2014); *Bouton v. Peake*, 23 Vet.App. 70, 71-72 (2008); *Damrel v. Brown*, 6 Vet.App. 242, 245 (1994); *see also Bustos v. West*, 179 F.3d 1378, 1380-81 (Fed. Cir. 1999). In other words, "CUE is a very specific and rare kind of 'error' . . . of fact or law, that when called to the attention of later reviewers compels the conclusion, to which reasonable minds could not differ, that the result would have been manifestly different but for the error." *Fugo v. Brown*, 6 Vet.App. 40, 43 (1993).

In reviewing Board decisions evaluating allegations of CUE in prior final decisions, the Court "cannot conduct a plenary review of the merits of the original decision." *Andrews v. Principi*, 18 Vet.App. 177, 181 (2004) *aff'd sub nom. Andrews v. Nicholson*, 421 F.3d 1278 (Fed. Cir. 2005); *see Archer v. Principi*, 3 Vet.App. 433, 437 (1992). Rather, the Court's overall review of a Board decision finding no CUE in a prior, final RO decision is limited to determining whether the Board's CUE finding was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 38 U.S.C. § 7261(a)(3)(A), and whether it was supported by adequate reasons or bases on all material issues of fact and law, 38 U.S.C. § 7104(d)(1). *See Cacciola v. Gibson*, 27 Vet.App. 45, 59 (2014); *King*, 26 Vet.App. at 439. The components that lead to a valid CUE finding,

however, are subject to review under the standards applicable to each component. *Hopkins v. Nicholson*, 19 Vet.App. 165, 167-68 (2005). Whether applicable law or regulation was applied or was correctly applied is a question of law, which the Court reviews de novo. *Id*. at 168; *see also George v. Shulkin*, 29 Vet.App. 199, 206 (2018); *Stallworth v. Nicholson*, 20 Vet.App. 482, 487 (2006); *Joyce v. Nicholson*, 19 Vet.App. 36, 43-44 (2005); *Andrews*, 18 Vet.App. at 182.

Mr. Simmons argues that the Board made clear errors of law as to 38 U.S.C. §§ 105(a) and 1111 (formerly 38 U.S.C. § 311 (1970)) when it determined there was no CUE in the RO's failure to apply the presumptions of service incurrence and soundness. Appellant's Brief (Br.) at 4-14; Reply Br. at 1-13. He argues that, consistent with evidence extant in 1974, the Board made favorable findings of fact that in service he was diagnosed with an acquired psychiatric disability not noted upon service entry, and therefore the Board should have found that the RO erred in 1974 (1) in not affording him the presumptions under sections 105(a) and 1111 and (2) in not concluding that such disability was incurred during service, meeting the second element of service connection. Appellant's Br. at 4-5; *see Shedden v. Principi*, 381 F.3d 1163, 1166-67 (Fed. Cir. 2004) (noting that to establish service connection, "the veteran must show (1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service").

A. The Board's Presumption of Soundness Analysis

The presumption of soundness under section 1111 dictates that a veteran shall be presumed to have been in sound condition when entering service, except as to disorders noted upon a service entrance examination. 38 U.S.C. § 1111; 38 U.S.C. § 311 (1970)[2]; *see Holton v. Shinseki*, 557 F.3d 1362, 1367 (Fed. Cir. 2009); *Dye v. Mansfield*, 504 F.3d 1289, 1293 (Fed. Cir. 2007). "[T]he presumption of soundness serves as a shield against any assertion by the Secretary that a veteran's in-service disability that was not noted upon entry to service preexisted service." *Gilbert v. Shinseki*, 26 Vet.App. 48, 52 (2012). It "is not a sword for the veteran to fulfill the second element of service connection without any evidence of the manifestation of an in-service disability." *Id*. For the presumption of soundness to apply, there must be evidence of an injury or disease manifesting during service that was not noted upon entry. *Id*.; *see Holton*, 557 F.3d at 1367; *Horn*

---

[2] In 1974, the presumption of soundness was codified at section 311, but the current statute is substantially similar to the version in effect in 1974.

*v. Shinseki*, 25 Vet.App. 231, 236 (2013). Once the presumption applies, and if the Secretary is unable to rebut it, the injury or disease that manifested during service is presumed to have been incurred during service, thus satisfying the second element of service connection. *See Gilbert*, 26 Vet.App. at 52; *Horn*, 25 Vet.App. at 236; *see also Shedden*, 381 F.3d at 1166-67.

The Board noted that Mr. Simmons was seeking "the benefit of [the] presumption of soundness . . . as no pre-existing mental health disorder was noted on the service entrance examination [report]" and "evidence of record extant at the time was legally insufficient to rebut the presumption of soundness and did not contain clear and unmistakable evidence that [he] had a pre-existing mental health disorder that was not aggravated by such service." R. at 14. However, the Board characterized this argument as an attempt to convert the case from one for direct service connection to one for preexistence and aggravation and concluded that, because no question of preexistence was raised at the time of the September 1974 RO decision, the presumption of soundness was not applicable and the RO did not err in not addressing it. R. at 17.

Although the Board correctly noted that Mr. Simmons is seeking to benefit from the presumption of soundness, it misunderstood his argument. Mr. Simmons's argument below was that, because there was no notation of an acquired psychiatric disability on his service entrance examination report, he should have been presumed sound at entry as to his psychiatric condition and any psychiatric condition that occurred during service would be presumed to have manifested during service. Mr. Simmons was not alleging that the RO failed to rebut the presumption in an attempt to have the high burden on VA of rebuttal to prove with clear and unmistakable evidence both that a psychiatric disorder did not pre-exist service and was not aggravated by service. R. at 17. Instead, Mr. Simmons is simply seeking the benefit of the presumption—namely, that the in-service notations of mental health complaints following a clear entrance examination establish that a mental health condition arose during service and did not pre-exist service.

Regardless of the Board's characterization, the Court's role in reviewing the Board decision is to determine if the Board's CUE determination was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The presumption of soundness is triggered by evidence of manifestation during service of an injury or disease not noted upon entry to service. *Holton*, 557 F.3d at 1367; *Gilbert*, 26 Vet.App. at 52; *Horn*, 25 Vet.App. at 236. Although the Board acknowledged several in-service psychiatric symptoms and that they were not noted upon entry, it found that the presumption of soundness did not apply. R. at 16-17. This Board finding is a clear

7

misapplication of law. *See Holton*, 557 F.3d at 1367; *Gilbert*, 26 Vet.App. at 52; *Horn*, 25 Vet.App. at 236.

## B. The Board's Presumption of Service Incurrence Analysis

The presumption of service incurrence[3] under section 105(a) establishes that an injury or disease incurred during active service was incurred in the line of duty and was not the result of misconduct. 38 U.S.C. § 105(a)[4]; *see Holton*, 557 F.3d at 1366-67; *Dye*, 504 F.3d at 1292. In certain ways, the presumption of service incurrence operates similarly to the presumption of soundness. The presumption of service incurrence serves as a shield against any assertion by the Secretary that a veteran's in-service injury or disease was not in the line of duty or was caused by the veteran's willful misconduct or abuse of alcohol or drugs. *See Holton*, 557 F.3d at 1367. Also, the presumption of service incurrence is triggered by evidence of an in-service injury or disease. *See id.* Most importantly, once the presumption applies and the Secretary is unable to rebut it, the injury or disease that manifested during service is presumed to have been incurred during service, satisfying the second element of service connection. *See id.*; *Dye*, 504 F.3d at 1292.

In its decision, the Board found that the presumption of service incurrence did not apply because "the evidence must first demonstrate that there is a mental health disability incurred in service" for Mr. Simmons to receive the benefit of the presumption. R. at 16. The Board then referenced the 1974 examiner's opinion, seemingly to conclude that the presumption was not triggered because the in-service mental health symptoms were not *related* to the post-service diagnosed anxiety reaction with depressive features, which the examiner attributed to the non-service-connected rheumatoid arthritis. *See* R. at 1457. But whether the in-service symptoms were attributable to the post-service psychiatric disability concerns nexus, the third prong of service connection. *See Shedden*, 381 F.3d at 1167. The presumption of service incurrence relates exclusively to the second prong of service connection, incurrence in service; therefore, the question of linkage to service is irrelevant to whether the presumption applies. *See Holton*, 557 F.3d at 1367; *Dye*, 504 F.3d at 1292; *Shedden*, 381 F.3d at 1367.

The Secretary argues that Mr. Simmons was in fact "not diagnosed with a disability [in service, but] rather was assigned with symptoms of depression," noting that "service treatment

---

[3] The presumption of service incurrence is alternatively called the presumption of service connection or the line-of-duty presumption.

[4] The current statute is substantially similar to the version in effect in 1974. U.S.C. § 105(a) (1970).

records fail to show a confirmed diagnosed disability." Secretary's Br. at 12; *see* Oral Argument at 39:00-42:06, *Simmons v. O'Rourke*, U.S. Vet. App. No. 16-3039. His arguments, however, are unsupported by the evidence as there is no indication from the service treatment records that the diagnoses of "depressive reaction," R. at 128, and "situational depression," R. at 129, were provisional diagnoses or were not confirmed. *See* R. at 130 (noting that Mr. Simmons was referred for psychiatric consultation because, between April and December 1969, he was "continuing and progressively becoming depressed"). Moreover, even if the Secretary's characterization is correct—that the in-service mental health symptoms were not manifestation of an in-service disease or injury that is subject to service connection but were instead manifestations of a non-service-connectable personality disorder—it is the Board's responsibility to provide such an analysis and the Court cannot accept the Secretary's post-hoc rationalizations. *See In re Lee*, 277 F.3d 1338, 1345-46 (Fed. Cir. 2002) ("'[C]ourts may not accept appellate counsel's post hoc rationalization for agency action.'") (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *Smith v. Nicholson*, 19 Vet.App. 63, 73 (2005) ("[I]t is not the task of the Secretary to rewrite the Board's decision through his pleadings filed in this Court.").

The presumption of service incurrence is triggered by evidence of manifestations during service of an injury or disease. *Holton*, 557 F.3d at 1367. Although the Board acknowledged several in-service notations of psychiatric symptoms, it found that the presumption of service incurrence did not apply. R. at 16. This Board finding is a clear misapplication of law. *See Holton*, 557 F.3d at 1367; *Dye*, 504 F.3d at 1292.

C. The Board's Conclusion Concerning No Manifestly Changed Outcome

As we have explained, the Board erred as a matter of law when it concluded that the RO in 1974 need not have considered sections 105(a) and 1111. Merely finding an error, however, is not enough for Mr. Simmons to prevail. We are statutorily required to consider whether those errors prejudiced him. 38 U.S.C. § 7261(b)(2); *see Hilkert v. West*, 12 Vet.App. 145, 151 (1999) (en banc) (appellant has the burden to show prejudicial error). The matter is somewhat more complicated in the context of CUE because part of the analysis that the Board undertakes incorporates a form of prejudicial error analysis—an error cannot be CUE unless it would have "manifestly changed the outcome" of the underlying agency decision. *Fugo*, 6 Vet.App. at 43; *Russell*, 3 Vet.App. at 113-14.

9

Whether the Board addressed the "manifestly changed outcome" prong of the CUE analysis, and did so adequately, is important because the answer to that question dictates our scope of review. Whether an error would have manifestly changed the outcome of a VA benefits decision is a mixed question of law and fact because that question "involves the application of law . . . to a specific set of facts." *Butts v. Brown,* 5 Vet.App. 532, 538 (1993); *see Joyce*, 19 Vet.App. at 42-44; *Andrews*, 18 Vet.App. at 182. Thus, if the Board reaches the manifestly changed outcome question, as it must in a CUE context if it finds error in the underlying decision, and determines that there would have been no manifestly changed outcome, this Court may only set aside that Board finding if it is arbitrary or capricious, 38 U.S.C. § 7261(a)(3)(A),[5] or if it was unsupported by adequate reasons or bases, *see Allday v. Brown*, 7 Vet.App. 517, 527 (1995). Thus, in the context of our review of a Board decision on CUE, if we determine that the Board's manifestly changed outcome conclusion as to the underlying decision was not arbitrary or capricious and that it was supported by adequate reasons or bases, there would be no need for the Court to employ a prejudicial error analysis because there would be no Board error, the predicate for a Court harmless error analysis.[6]

An example will help illustrate this point. Assume that, as in this appeal, the Board concluded that the RO in 1974 did not need to apply sections 105 and 1111, but then went further and concluded, based on fully adequate reasons or bases, that, even assuming the RO should have applied these statutory provisions, there was no CUE in the underlying RO decision because the outcome would not have been manifestly different. In this situation, if the Court concluded that the Board's manifestly changed outcome conclusion was not arbitrary or capricious, there would be no need to assess prejudice with respect to any Board error on sections 105 and 1111 because the Board in essence would have corrected its own error and adequately explained that there would be no manifestly changed outcome even if the RO applied sections 105 and 1111. In this hypothetical belt-and-suspenders approach, although the Board's belt approach contained error, its suspenders

---

[5] As the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) has recognized, because the "arbitrary or capricious" and "clearly erroneous" standards are so similar, the differences between them are "in actual practice a matter for academic debate." *Munn v. Dept. of Health & Hum. Servs.,* 970 F.2d 863, 872 (Fed. Cir. 1992); *Butts,* 5 Vet.App. at 544 (arguing that there is no material difference between the "arbitrary or capricious" standard and the "clearly erroneous" test) (Steinberg, J., concurring).

[6] The Court cautions that, if the Board commits a procedural error when making its CUE determination, we would need to assess whether this procedural error prejudiced the claimant under the standards we articulate in the next section of this opinion.

approach did not, and it fully supported its determination that there was no CUE in the RO's 1974 decision.

Things are quite different if the Board found no error and never took the additional step of adequately analyzing whether the alleged error, had it occurred, would have manifestly changed the outcome of the underlying decision. In that case, to comply with our statutory mandate to account for prejudicial error, the Court would have to assess whether any Board error in concluding that there was no error in the underlying RO decision was prejudicial to the claimant.

Here, after discussing why the statutes at issue were not relevant, the Board also stated that "the Veteran has not offered an explanation as to how the outcome would have been manifestly different but for the errors claimed," R. at 18, and then continued by stating that "to demonstrate CUE in a Board decision, it must be clear that a different result would have ensued but for the claimed error." *Id*. However, aside from noting Mr. Simmons's burden to show prejudice, the Board did not sufficiently explain why the RO's failure to apply the presumptions would not have manifestly changed the outcome in 1974. It gave no rationale for the Court to review under section 7104(a)(3)(A) and, thus, violated section 7104(d)(1) by not providing adequate reasons and bases. The Board did not adequately discuss whether the presumptions, if correctly applied, would have manifestly changed the outcome of the claim. Given this, the Court now must assess the harmfulness of the Board's failure to apply sections 105 and 1111, something we turn to next.

### III. HARMLESS ERROR

Although the Board erred in its analysis of whether the presumptions of soundness under section 1111 and service incurrence under section 105(a) should have been applied in the September 1974 RO decision, as we explained, the Court has a duty to consider whether the Board's errors prejudiced Mr. Simmons because the Board did not adequately address the "manifestly changed outcome" portion of the CUE analysis. In reviewing a Board decision, this Court must "take due account of the rule of prejudicial error." 38 U.S.C. § 7261(c)(2); *Sanders*, 556 U.S. at 406-07; *Vogan v. Shinseki*, 24 Vet.App. 159, 161-62 (2010). Congress's use of the words "take due account" and "prejudicial error," the words used in the Administrative Procedure Act (APA), inform us that we are to apply "the same kind of 'harmless-error' rule that courts ordinarily apply in civil cases." *Sanders*, 556 U.S. at 406-07. *Compare* 38 U.S.C. § 7261(c)(2) *with* 5 U.S.C. § 706 (APA: "The reviewing court . . . shall review the whole record . . . and due

11

account shall be taken of the rule of prejudicial error."). A review of legislative history confirms that Congress expressly included a reference to the APA's rule of prejudicial error to guide this Court in its application of that rule. *See* S. Rep. No. 100-418, p. 61 (1988).

In *Sanders*, the Supreme Court found no "relevant distinction between the manner in which reviewing courts treat civil and administrative cases" and provided further guidance on how this Court must conduct a harmless error analysis. 556 U.S. at 407-14. Specifically, the Supreme Court, in invalidating a harmless-error framework established by the Federal Circuit, highlighted several considerations that shape this Court's harmless error analysis. *Id*. Together, these considerations inform us that prejudice is established by demonstrating a disruption of the essential fairness of the adjudication, which can be shown by demonstrating that the error (1) prevented the claimant from effectively participating in the adjudicative process, or (2) affected or could have affected the outcome of the determination. As explained below, we conclude that the Board's errors did not disrupt essential fairness; first, though, we review the basics of this Court's harmless error framework.

First, a reviewing court's role in conducting a harmless error analysis is to assess whether the error affected the claimant's substantial rights. *See id*. at 407. Generally, such consideration equates to whether the result would be different had the error not occurred. *See id.* at 411; *see also Vogan*, 24 Vet.App. at 163; S. Rep. No. 100-418, p.61 ("[A] court should pass over errors in the record of the administrative proceedings that the court finds not to be significant to the outcome of the matter."). However, courts must also consider the effect of the error on the "perceived fairness, integrity, and public reputation of judicial proceedings." *Sanders*, 556 U.S. at 411-12; *see Vogan*, 24 Vet.App. at 163.

Second, a harmless error analysis generally should be conducted through a case-specific application of judgment based upon examination of the individual record, rather than based on mandatory presumptions of prejudicial error and rigid rules. *Sanders*, 556 U.S. at 407-08 (noting that the statutory language of the federal harmless-error rule "seeks to prevent appellate courts from becoming impregnable citadels of technicality" (citing *Kotteakos v. United States*, 328 U.S. 750, 759 (1946))).

Third, irrespective of the prohibition against mandatory presumptions of prejudice, courts may make generalizations about the types of errors that typically prove harmful to claimants. *Id.* at 411 (noting that reviewing courts may learn over time that certain errors naturally affect a

12

litigant's substantial rights (citing *Kotteakos*, 328 U.S. at 760-61)). Although these generalizations must not control, courts may consider these "natural effects" in conducting a harmless error analysis. *Id.* The Supreme Court cautioned, however, that courts must not generalize too broadly, but instead may consider these "natural effects," along with other factors, within "the specific factual circumstances in which the error arises." *Id.* at 411-12. Of note, the Supreme Court specifically acknowledged that it is this Court "that sees sufficient case-specific raw material in veterans' cases to enable it to make empirically based, nonbinding generalizations about 'natural effects,'" and is better able to make informed judgments regarding "natural effects." *Id.* at 412.

Fourth, the appellant generally bears the burden of demonstrating the prejudicial effect of an error. *Id.* at 409-11. In circumstances where the prejudicial effect of an error is not obvious, the aggrieved party "normally must explain why the erroneous ruling caused harm." *Id.* at 410. The goal is not to "impose a complex system of 'burden shifting' rules or a particularly onerous requirement," but is an acknowledgement that in administrative cases, like in civil cases, the appellant is generally in a better position to explain how they have been harmed by an error. *Id.*

Finally, specific to the veterans benefits context, and underpinning all of the considerations above, the Supreme Court acknowledged some leeway in conducting a harmless error analysis due to the non-adversarial nature of the veterans benefits system. *Id.* at 412. As VA is statutorily obliged to assist veterans in the development of their claims and as veterans are often unrepresented throughout the administrative process, a reviewing court might consider an error harmful in a veteran's case where it might be considered harmless in other circumstances. *Id.*

Although *Sanders* provides a general framework for this Court's harmless error analysis, this case presents an opportunity for us to expand upon that framework, particularly in the context of our review of Board decisions on CUE motions.

A. Inherent Prejudice in Failing to Afford the Benefit of Two Presumptions?

Mr. Simmons argues that the Board's failure to recognize that the RO in 1974 should have afforded the benefit of the presumptions of soundness and service incurrence was sufficiently harmful that our harmless error analysis should end there. *See* Appellant's Supplemental (Supp.) Br. at 11-13; Oral Argument at 1:10:34-1:13:16; 1:16:28-1:16:55. He argues that the essential fairness of the adjudicative process is disrupted if the Board fails to correctly apply mandatory statutory and regulatory presumptive provisions. *See* Appellant's Supp. Br. at 11-13; Oral Argument 1:13:00-1:13:16 ("[C]learly, when a presumption is afforded by Congress or when VA

13

itself creates a regulatory presumption, then those presumptions have to be afforded for there to be the essential fairness of an adjudication."). Further, he argues that if the Court's harmless error analysis focuses solely on whether correction of the Board's error manifestly would result in a different outcome, it would undermine the importance and value of statutory and regulatory presumptions, *see* Oral Argument at 1:06:50-1:08:36, and "the totality of the adjudication process would be insulated from review and revision," Appellant's Supp. Br. at 13.

As noted, usually a harmless error determination is conducted through case-specific application of judgment without relying on mandatory presumptions of prejudicial error. *See Sanders*, 556 U.S. at 407-08. Contrary to the Supreme Court's instruction in *Sanders* to avoid mandatory presumptions of prejudice, Mr. Simmons implores this Court to find that failure by the Board to properly apply a statutory or regulatory provision is inherently prejudicial. He argues that, because the benefit of a presumption is to relieve a claimant from the burden of providing evidence of the relevant issue, failure to afford a claimant the benefit of the presumption is unfair, naturally harmful to the claimant, and undermines the essential fairness of the adjudicative process. *See* Appellant's Supp. Br. at 10-11; Oral Argument at 1:13:00-1:13:16; *see also* Oral Argument at 7:00-8:02, 25:07-26:56, 33:15-34:13, 1:06:50-1:08:37. He argues that such "natural effect" should lead this Court to an obvious conclusion of prejudicial error. Although no doubt such failure could prejudice a veteran, were this Court to adopt a presumption of prejudice in such circumstances, we would risk negating our statutory obligation to take due account of the rule of prejudicial error. Nevertheless, *Sanders* left the door open for this Court to make non-binding generalizations about inherently prejudicial errors, that is, errors where the "natural effect" is prejudicial. 556 U.S. at 411-12.

We have held on several occasions that VA claimants are entitled to a fair adjudicative process that includes certain rights and procedural safeguards. *See, e.g., Thurber v. Brown*, 5 Vet.App. 119, 123 (1993) ("The entire thrust of [] VA's nonadversarial claims system is predicated upon a structure which provides for notice and an opportunity to be heard at virtually every step in the process."); *Bernard v. Brown*, 4 Vet.App. 384, 392-94 (1993) (holding that VA claimants must be afforded "full benefits of . . . procedural safeguards" afforded by statutory and regulatory provisions establishing "extensive procedural requirements to ensure a claimant's right to full and fair assistance and adjudication in the VA adjudication process"). When an error abrogates the essential fairness of the adjudication or deprives a claimant of a meaningful

opportunity to participate in the processing of their claim, the error has the "natural effect" of being prejudicial. *See Sanders*, 556 U.S. at 411; *see also Overton v. Nicholson*, 20 Vet.App. 427, 434-35 (2006) ("A procedural or substantive error is prejudicial when the error affects a substantial right that a statutory or regulatory provision was designed to protect." (citing *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 553 (1984))).

We have not identified a finite set of errors that affect essential fairness or deprive a claimant of a meaningful opportunity to participate in the VA adjudicatory process. In *Overton*, pre-dating *Sanders*, we noted that proper notice regarding the evidence necessary to substantiate a claim and the person responsible for obtaining such evidence was significant in ensuring that a claimant was provided a meaningful opportunity to participate effectively in the processing of the claim. 20 Vet.App. at 435. In *Vazquez-Flores v. Shinseki*, post-dating *Sanders*, we noted that VA's lack of notice or defective notice to a veteran of evidence necessary to substantiate a claim would have a naturally prejudicial effect, but that incomplete notice would not necessarily have a naturally prejudicial effect because it would not prevent veterans from participating in the adjudication of their claims. 24 Vet.App. 94, 105-07 (2010). In *Arneson v. Shinseki*, we found that failure to afford an opportunity for a hearing before all Board decisionmakers deprived the claimant of an opportunity to meaningfully participate in the adjudicatory process. 24 Vet.App. 379, 388-89 (2011); *but see Bowen v. Shinseki*, 25 Vet.App. 250, 253-54 (2012) (finding no prejudicial error where the veteran was not provided a hearing at the RO level because the veteran was provided an opportunity for a hearing before the Board).

Other courts have considered similar factors when determining whether an error affected the essential fairness of the decision-making process. *See, e.g., United States v. Young*, 470 U.S. 1, 17 n4 (1985) (noting that federal courts have consistently required that for an error to be prejudicial, it must have an effect on jury deliberations—"[o]nly then would the court be able to conclude that the error undermined the fairness of the trial and contributed to a miscarriage of justice"); *Smith v. Phillips*, 455 U.S. 209, 217-21 (1982) (noting that due process does not require a new trial every time a juror is placed in a potentially compromising situation, particularly where the facts found demonstrated that the juror's conduct did not affect their impartiality); *United States v. Reynolds*, 710 F.3d. 498, 516-19 (3d Cir. 2013) (noting a distinction between technical errors in an agency's notice and comment procedures and an agency's "utter failure" to comply with notice and comment requirements); *California Wilderness Coalition v. U.S. Department of Energy*,

631 F.3d 1072, 1092 (9th Cir. 2011) (noting that harmless error is error that "has no bearing on the procedure used or the substance of the decision reached." (internal citation omitted)); *United States v. Rivera*, 273 F.3d 751, 757 (7th Cir. 2001) (finding an errant jury instruction prejudicial where it "had serious potential to affect the outcome" and thus "undermined the essential fairness and integrity of the trial"); *Ficek v. Southern Pacific Company*, 338 F.2d 655, 657 (9th Cir. 1964) (distinguishing between "substantive fairness" and "essential fairness" of an arbitration, the latter meaning that the arbitration proceeding met the minimal requirements of fairness—notice, a full and fair hearing, and a decision based on the honest judgment of the adjudicators); *see also McDonough Power Equipment Inc.*, 464 U.S. at 553 (noting that "a litigant is entitled to a fair trial but not a perfect one" (internal citation and alteration omitted)).

Mr. Simmons asks us to equate the Board's failure to ensure that the RO in 1974 afforded him the benefit of two statutory presumptions, which, if afforded, would result in fulfillment of one of three elements of service connection, with failure to afford various due process and other safeguard factors related to ensuring that justice is served and that lie at the core of any decision-making process. *See* Oral Argument at 1:12:31-1:13:00. But we do not agree that the two are equivalent. Aside from stating that the natural effect of failure to abide by these presumptions is harmful, Mr. Simmons has not persuasively demonstrated how the Board's error affected the essential fairness of the adjudication as to CUE here, or deprived him of a meaningful opportunity to participate in the fair processing of his claim. There is no indication that the Board's errors undermined the essential fairness and integrity of VA's decision-making process in relation to his CUE motion and he points to no factor on a scale with lack of notice, defective notice, lack of opportunity for a hearing, partiality or dishonesty of a decision-maker, or any other factor that would violate even minimum standards of fairness. Particularly here, where the presumptions at issue relieve a claimant of affirmatively providing evidence on a single element out of several required for success, the failure to properly apply a presumption does not have the natural effect of preventing meaningful participation in the VA decision-making process. Therefore, even considering the pro-claimant nature of the veterans benefits system, we hold that the failure to afford the benefit of the type of statutory or regulatory presumption at issue in this case is not an inherently prejudicial error, although it may nevertheless be prejudicial in a particular case.

B. When No Inherent Prejudice, Look at Individual Circumstances

As we have found that the Board's error in Mr. Simmons's case—the failure to properly afford him the benefit of the aforesaid statutory presumptions—is not inherently prejudicial, we must now look at the individual circumstances surrounding the Board's error to determine if it prejudiced Mr. Simmons. In cases not involving allegations of CUE, this usually involves looking at the effect of Board error on the Board's ultimate decision to determine if the error prejudiced the claimant.

But Mr. Simmons argues that this Court's *Archer* decision prohibits the Court in this case from assessing prejudice as we normally do. *See* Oral Argument at 3:42-6:19, 8:02-8:46, 24:33-25:07; 34:59-35:58, referring to *Archer*, 3 Vet.App. at 437 (In reviewing a Board decision on a CUE motion, "[w]e cannot conduct a plenary review of the merits of the original decision; rather, we are limited to determining whether the [Board's] subsequent decision . . . was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." (internal citation omitted)); *see also Andrews*, 18 Vet.App. at 181-82 (reiterating our standard of review of a Board decision on a CUE motion, as enunciated in *Archer*). He argues that this Court's usual harmless error review, which generally involves determining whether Board error would have made a difference in a benefits determination outcome, would compel us to engage in plenary review of the underlying facts of the RO decision, an endeavor that the Court in *Archer* prohibited. For several reasons, the Court disagrees.

*First*, in *Archer* the Court did not engage in a harmless error analysis, because it did not find any error in Mr. Archer's Board decision. Its pronouncement prohibiting plenary review therefore only applied to the kind of review that it conducted in Mr. Archer's case—the Court's review of Mr. Archer's Board decision for arbitrariness or capriciousness. Therefore, the Court concludes that the *Archer* prohibition against plenary review of the underlying facts does not apply at the stage where we shoulder our statutory obligation to examine for prejudicial error, consequent to finding that the Board erred in its CUE determination.

Essentially, although Mr. Simmons argues that our harmless error analysis cannot involve a plenary review of the underlying facts, his argument overlooks that the Court in reviewing a Board decision on a CUE motion undertakes two separate inquiries. The prohibition on plenary review applies when the Court is determining whether the Board decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. In contrast, when conducting a

17

harmless error analysis, the Court has already determined that the Board has erred and that the Board did not address, or did not address adequately, whether, if the underlying decision were incorrect, the outcome would manifestly have been different. In that context, the Court is determining whether the Board error was prejudicial or affected the essential fairness of the adjudication. *See Sanders*, 556 U.S. at 411-12; *Arneson*, 24 Vet.App. at 388-89; *Vogan*, 24 Vet.App. at 163. That inquiry must go beyond the Board's analysis because "[t]he Board cannot predict every instance in which it might be found to have committed error," and, therefore, "cannot be expected to make specific factual findings that might facilitate a prejudicial error analysis." *Vogan*, 24 Vet.App. at 163; *see id*. at 163-64 ("If the Court's review were restricted to findings made by the Board, the usefulness of Congress's direction that we examine an error for prejudice would be marginalized as a tool for avoidance of remands that entail no realistic prospect of an outcome more favorable to a veteran."). Undertaking harmless error review after finding Board error in a Board decision on a CUE motion does not violate *Archer* but instead begins a separate, statutorily required step in our review of a Board decision on CUE.[7]

*Second*, precedent indicates that the Court's harmless error analysis is exceedingly broad. In *Newhouse v. Nicholson*, the Federal Circuit noted that section 7261(b)(2) does not limit our prejudicial error analysis to the facts as found by the Board, but rather requires a full review of the record to determine if the error is prejudicial. 497 F.3d. 1298, 1302 (2007). Similarly, in *Vogan*, we held that the statute "places no limitations on the scope" of a harmless error analysis. 24 Vet.App. at 163; *see Mayfield v. Nicholson*, 19 Vet.App. 103, 114 (2005) (noting that the Court's ability to take due account of the rule of prejudicial error "leaves us with considerable latitude as to how to 'take due account'"), *rev'd on other grounds, Mayfield v. Nicholson*, 444 F.3d 1328 (Fed. Cir. 2006).

Having determined that the Board erred, that those errors did not have the natural effect of prejudicing Mr. Simmons, and that conducting a prejudicial error analysis here will not violate *Archer*, we turn now to determining whether the Board's errors prejudiced Mr. Simmons. *See*

---

[7] This discussion is similar to the one set forth above concerning the different inquiries that the Court may make in reviewing Board decisions regarding CUE. When the Court reviews whether a Board's determination regarding the existence of CUE is arbitrary or capricious, *Archer* has force. The Court does not look through the Board decision to assess the underlying decision that is the subject of the CUE motion. In contrast, when the Court is determining whether any Board error is prejudicial to the appellant, the Court is considering prejudicial error as an original matter. Because the Board's CUE determination involves a "manifestly different outcome" component, the only way to assess any prejudice in a Board error is to consider the decision that is the subject of the CUE motion.

18

*Sanders*, 556 U.S. at 411-12; *Vazquez-Flores*, 24 Vet.App. at 107 ("[P]rejudice is not assessed in a vacuum; rather it is based on the facts and circumstances presented in the entire record."). That inquiry must be guided by whether essential fairness was disrupted by the error, usually demonstrated by determining whether the error affected the Board's ultimate decision or prevented the claimant from effectively participating in the process. *See Sanders*, 556 U.S. at 411-12; *Arneson*, 24 Vet.App. at 388-89; *Vogan*, 24 Vet.App. at 163.

The Court concludes that the Board errors did not prevent Mr. Simmons from participating in the processing of his CUE motion or affect the overall fairness of the adjudicative process. Mr. Simmons, through counsel that currently represents him before this Court, initiated his CUE motion in December 2005. R. at 326-33. In his original motion, and in subsequent statements, Mr. Simmons, through counsel, advanced arguments similar to those he now raises—that the RO did not apply the presumptions of soundness and service incurrence. *See* R. at 194-202, 293-300, 326-33. The Board specifically addressed these contentions in the May 2016 decision here on appeal. R. at 14-18. Although the Court concludes that the Board itself misapplied the statutory presumptions, there is no indication that Mr. Simmons has not been provided a meaningful opportunity to participate in the processing of his CUE motion or that the overall adjudicative process was unfair.

The Board's errors also did not affect its ultimate determination—that there was no CUE in the September 1974 RO decision denying service connection for an acquired psychiatric disorder—because, even if it had not made those errors, the Court concludes that the Board would not have found CUE in the September 1974 RO decision. The presumptions of soundness and service incurrence relieve a claimant of providing evidence that satisfies the second—or in-service—prong of service connection; the presumptions do not relieve a claimant of providing evidence of the third—or linkage—prong of service connection.[8] *See Holton*, 557 F.3d at 1367; *Dye*, 504 F.3d at 1292; *Shedden*, 381 F.3d at 1367; *Horn*, 25 Vet.App. at 236. Mr. Simmons argues that the June 1974 private medical opinion provides that linkage. Appellant's Br. at 10; *see* Appellant's Supp. Br. at 12. The June 1974 private medical opinion indicated that Mr. Simmons's then-current (non-service-connected) inflammatory or rheumatoid arthritis began during service, manifesting itself in service as depression. Despite Mr. Simmons's assertions to the contrary, the

---

[8] The parties agree that, in 1974, Mr. Simmons had evidence sufficient to satisfy the first prong of service connection—a current disability.

private physician did not provide an opinion linking his then-current acquired psychiatric disorder to his in-service diagnoses of depressive reaction and situational depression or to any symptoms of mental depression.

And, even assuming that the opinion was favorable linkage evidence, the record before the RO in September 1974 also included the August 1974 VA examiner's opinion that Mr. Simmons's acquired psychiatric disability was secondary to a non-service-connected arthritic condition. R. at 1457. Therefore, despite his arguments, the Court cannot agree with Mr. Simmons that "[h]ad the presumption[s] been afforded[,] based on the evidence of nexus in the record, an award of service compensation would have been required." Appellant's Supp. Br. at 12.

Finally, the Court notes that, during oral argument, Mr. Simmons argued that, had VA properly applied the statutory presumptions, it would have triggered additional duties to develop the record for additional evidence. *See* Oral Argument at 15:48-19:57. To the extent that he is suggesting correction of the Board's error would trigger the *Board* to develop additional evidence, the Board's adjudication of CUE motions must be made on the evidence that existed at the time of the original decision. *See Pierce v. Principi*, 240 F.3d 1348, 1354 (Fed. Cir. 2001); *Caffrey v. Brown*, 6 Vet.App. 377, 383 (1994). Therefore, it is unclear what additional evidence the Board would have been required to develop. To the extent that Mr. Simmons is suggesting that the correction of any *RO* error in failing to apply the same statutory presumptions would have triggered additional development by the RO in 1974, duty-to-assist errors can never rise to the level of CUE. *Cook v. Principi*, 318 F.3d 1334, 1346-47 (2002); *Caffrey*, 6 Vet.App. at 383-84.

In summary, although the Board erred in its analysis of whether the presumptions of soundness and service incurrence applied in September 1974, its error neither affected a substantial right that disrupted the fundamental fairness of the adjudication nor affected its ultimate determination. Because, even with correction of its error with regard to sections 1111 and 105(a), the Board could not have found CUE in the September 1974 RO decision, the Board's error is harmless. *See, e.g., Sanders*, 556 U.S. at 411-12; *Vogan*, 24 Vet.App. at 163. Therefore, this matter will be affirmed.

## IV. CONCLUSION

Upon consideration of the foregoing, the May 13, 2016, Board decision is AFFIRMED.

20